UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. ACTION NO. 3:23-00070-01 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| KYLAN D. MANNING (01) | MAG. JUDGE KAYLA D. MCCLUSKY |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 37] filed by Defendant, Kylan Manning. For reasons stated below, it is recommended that the motion be DENIED.

### Background

On January 19, 2023, City of Monroe Police Detective Anthony Cowan (hereinafter "Cowan" or "Detective Cowan") applied for and obtained a search warrant for a house located at 3200 Polk Street, Monroe, Louisiana, where suspected marijuana dealer and DuceFive gang member, Kylan Manning ("Manning"), resided. In the search warrant application, Cowan represented that he and other Monroe Police Department ("MPD") "Heat units" had used a Reliable Confidential Informant ("RCI," also sometimes referred to herein as "CI") to conduct four controlled buys, allegedly with Manning, one of which was consummated in the carport of the 3200 Polk Street residence.

On January 23, 2023, Cowan and the MPD SWAT team executed the search warrant at the 3200 Polk Street residence, where they found and arrested Manning. They also seized multiple bags of marijuana, a gun, several digital scales, and boxes of sandwich bags from Manning's room. (July 11, 2023 Detention Hearing Transcript, pg. 11).

As a result of the investigation, a federal grand jury returned a two-count indictment against Manning on March 22, 2023, charging him with possession with intent to distribute marijuana and possession of a firearm in furtherance of drug trafficking in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) and 18 U.S.C. § 924(c)(1), respectively.   The indictment also included forfeiture allegations.   Manning was arraigned on May 4, 2023, whereupon he entered a plea of not guilty as to each count.

On July 11, 2023, the court began a detention hearing for Manning, but continued the hearing until August 29, 2023, to obtain additional information regarding a potential third-party custodian for Manning.   *See* Det. Hearing Transcripts [doc. #s 27 & 36] (hereinafter, DH Tr. 1 & 2, respectively).   In between the hearing dates, Detective Cowan learned that Manning had not been present for two of the controlled buys that supported the search warrant.   (DH Tr. 2, pgs. 4, 10).

On October 31, 2023, Manning filed the instant motion to suppress all evidence obtained from the search of the residence at 3200 Polk Street, Monroe, Louisiana.   Manning argues that the affidavit in support of the search warrant included inaccurate and misleading information that the affiant, i.e., Detective Cowan, knew to be false or misleading or that he acted in reckless disregard for the truth.   Furthermore, when the false and misleading statements are redacted from the affidavit, the remaining facts do not suffice to support probable cause for issuance of the warrant.

On November 14, 2023, the Government filed its response to the motion, wherein it disputed Manning's contention that the false statements in the search warrant affidavit were intentional or reckless.   (Gov.'t Response [doc. # 38]).   Moreover, even if the false statements had been intentionally or recklessly made, probable cause remained for issuance of the search

warrant on the basis, at minimum, of the January 2, 2023 controlled buy of marijuana that occurred at the 3200 Polk Street residence. Furthermore, "[b]ecause the officers did not know until after the search warrant was executed that the CI had been dishonest, law enforcement had a good faith reliance [sic] on the warrant." *Id*.

On December 1, 2023, Manning filed a reply brief, stressing that the warrant affidavit contained no information to establish the reliability of the informant. (Def. Reply [doc. # 42]). He also faulted Cowan for failing to confirm that the phone number that purportedly belonged to Manning actually belonged to someone else.

The court held a hearing on the motion to suppress on January 31, 2024. *See* doc. #s 56 & 60. Manning filed his post-hearing memorandum on May 1, 2024. He emphasized that the search warrant application contained no information to show that the RCI was reliable. (Def. Post-Hearing Memo. [doc. # 63]). He further argued that the search warrant was stale at the time it was executed and that no reasonable officer could have relied on the warrant in good faith. Manning also questioned the reliability of Detective Cowan, in light of inconsistencies in his testimony at the detention and suppression hearings.

The Government filed its response to Manning's post-hearing brief on May 7, 2024. (Gov.'t Response [doc. # 64]). It maintained that the errors in the warrant application were subject to the good faith exception because there was no intentional or reckless disregard for the truth.[1]

On May 10, 2024, Manning filed a reply brief. (Def. Post-Hearing Reply [doc. # 68]). Accordingly, the matter is ripe.

---

[1] The Government also referenced a video that depicts, "the CI [ ] directing Mr. Manning to come to his residence." *Id*., pg. 2. However, no video was introduced into evidence.

3

**Relevant Testimony and Documentary Evidence**

The lone witness to testify at the hearing was Detective Cowan, who was called by the defense. Neither side introduced any documentary evidence. Nonetheless, Manning attached to his motion to suppress a copy of the January 19, 2023 search warrant at issue, the supporting application, and the search warrant return. [doc. # 37-1]. The search warrant return, however, is illegible.

Cowan is a detective with Metro Narcotics and is a seven-year veteran with the MPD. (Suppression Hearing Transcript, pg. 3) (hereinafter, abbreviated to "Tr.") [doc. # 60]; DH Tr. 2, pgs. 4-5 [doc. # 27] . Over the years, he has attended annual training programs pertaining to search warrants, narcotics search warrants, and investigations. (Tr. 3-4). Cowan prepared the search warrant at issue in this case and electronically transmitted it to the judge on January 19, 2023. (Tr. 4). He relied on a CI, plus information that he had gathered from his own investigation. (Tr. 5).

The court paraphrases pertinent provisions of the warrant application that Cowan presented to Fourth Judicial District Court Judge Stephens Winters, as follows:

(1) An RCI advised MPD "Heat units" that the RCI could purchase marijuana from the #2 person in the DuceFive gang, i.e., Manning.

(2) On December 28, 2022, Cowan advised the RCI to contact Manning to set up a controlled purchase. The RCI then proceeded to a predetermined meeting location, whereupon Manning notified the RCI that he was in a white SUV. The RCI walked over to the SUV and was greeted by the driver, Lazebeon Harris ("Harris"). The RCI gave the buy money obtained from MPD to Harris who passed it to Manning in the rear of the vehicle. Manning then passed the marijuana to Harris, who, in turn, gave it to the RCI.

(3) On December 30, 2022, Detective Cowan again made contact with the RCI, who agreed to participate in another controlled purchase of marijuana from Manning. The RCI contacted Manning via cellphone, whereupon Manning advised the RCI to go to 211 Mouton Avenue to purchase the marijuana. The RCI proceeded to the

location and met Manning who was walking in the front yard of the residence. The RCI and Manning exchanged money for marijuana. The RCI noticed that Manning had dropped a loaded .40 magazine in the front yard. Accordingly, the RCI grabbed the magazine and returned it to Cowan, together with the purchased marijuana.

(4) On January 2, 2023, Detective Cowan again made contact with the RCI, who agreed to participate in another controlled purchase of marijuana from Manning. The RCI contacted Manning, who advised the RCI to come to his residence at 3200 Polk Street to purchase the marijuana. The RCI met Manning under the carport of the residence and conducted a hand-to-hand transaction with him.

(5) On January 3, 2023, Detective Cowan again contacted the RCI, who agreed to participate in another controlled purchase of marijuana from Manning. The RCI contacted Manning who advised the RCI to proceed to the "Quick and Easy" at 2000 Jackson Street to purchase marijuana. Upon arrival, Manning contacted the RCI and advised the RCI that he was pulling into the parking lot. At that time, Cowan observed a gray Chevrolet Malibu pull into the parking lot. The RCI exited his vehicle and DuceFive member Devondre Stewart ("Stewart") exited the front passenger seat of the Malibu. After speaking with Stewart, the RCI approached the front driver window of the vehicle and completed a hand-to-hand transaction with "Stewart." [sic].

(6) Prior to each of the controlled buys, MPD Heat units "met the RCI at a predetermined meeting location." Furthermore, Cowan and/or MPD Heat units searched the RCI beforehand to ensure that he had no narcotics. After each of the buys, the RCI returned to the predetermined meeting location and transferred the purchased marijuana to Cowan.

(7) For each of the four controlled buys, the MPD provided the RCI with a clandestine recording device that transmitted audio, video, and GPS location to ensure the safety and integrity of the controlled buy.

(8) Cowan obtained an arrest warrant for Manning on four counts of distribution of marijuana and one count of conspiracy to distribute narcotics.

(9) Cowan explained that, based on his experience with working narcotics, it was common practice for someone who is distributing narcotics to keep the tools of the trade, a ledger, weapons, cash, cellphones, etc. in their residence.

(10) Cowan was able to determine that 3200 Polk Street was Manning's primary residence and the residence of Comalethia Manning.

(11) On January 19, 2023, Cowan and other Metro Narcotics agents conducted surveillance on Manning's residence where they observed Manning standing in the driveway. They saw an individual arrive in a vehicle, who then briefly disappeared out of view before reentering the vehicle and departing. This type of behavior was consistent with narcotics activity and demonstrated that Manning continued to distribute narcotics out of his residence.

(Application for Search Warrant; M/Suppress, Exh. [doc. # 37-1])

On the first day of the detention hearing, Cowan testified that he personally observed the December 30 transaction and was about five houses away at the time. (DH Tr. 1, pgs. 26-27, 33). The transaction was recorded on video, audio, and via GPS. *Id.*, pg. 28. According to Cowan, although Manning could not be visually identified from the video, Cowan was able to recognize Manning via the audio. *Id.*, pg. 29. Cowan also visually observed the first sale on December 28 from a parking lot across the street. *Id.*, pg. 34. Cowan could not recall whether Manning could be visually identified on the videos. *Id.*, pg. 32.

At the detention hearing, Cowan explained that the reason for the multiple controlled purchases in this case was because they did not have "good video." *See* Tr. 40.

At the detention hearing, Cowan testified that the January 2 transaction occurred in the afternoon. (DH Tr. 1, pgs. 36-38). Cowan stated that he observed the transaction from two blocks away, and that he clearly was able to identify Manning. *Id*. In fact, prior to the transaction, Cowan "and a few other guys" drove past the location and "100 percent" identified Manning. *Id*. Moreover, no one else but Manning was present. *Id*.

After the first day of the detention hearing in this matter, Cowan returned to his office and reviewed Facebook postings where he saw that Manning's family had gone on a Carnival Cruise. (Tr. 21-22). He reached out to Carnival and confirmed that Manning was on a cruise at

the time of the December 28 and December 30 controlled buys. *See* Tr. 20-23. He brought his discovery to the AUSA prosecuting this case, who promptly disclosed the finding to the court and Defendant at the resumed detention hearing. (Tr. 22; DH Tr. 2, pg. 4). Cowan explained that he did not want to bring charges against someone who was innocent. (Tr. 22).

Nonetheless, Cowan maintained that Manning was involved in the second set of two controlled purchases. (Tr. 22). Cowan obtained cell phone data records, after the fact (presumably post-indictment), which put Manning at the exact locations of the third and fourth transactions. *Id*. The cell phone records also established that Manning was out of the country for the first two transactions. *Id*.

Unlike the first two purchases which were arranged using a phone number (later determined to belong to "LeZaveon Parrish" (phonetic)),[2] the latter two purchases were set up via an audio call using Manning's Facebook Messenger app. (DH Tr. 2, pgs. 9-11). Although Cowan was not present for the calls, he reviewed the CI's phone afterwards and observed where he had contacted Manning. *Id*. Cowan stated that he saw where the January 2 call had been made to Manning's Facebook page. (Tr. 35).

When Cowan later confronted the CI about his mistaken representation that Manning was the seller at the first two purchases, the CI remained adamant that Manning had been present. (DH Tr. 2, pg. 10). At the resumed detention hearing, Cowan testified that he personally observed Manning at the January 2 and 3 controlled purchases. *Id*., pgs. 11-12.

---

[2] Notably, the warrant application referred to a "Lazebeon Harris." (Application for Search Warrant; M/Suppress, Exh. [doc. # 37-1]).

7

At the suppression hearing, Cowan stated that the January 2 transaction occurred after 10:00 p.m. and when dark outside. (Tr. 15). He attributed the discrepancy to the fact that he did not have his notes at the prior hearing. *Id*.

Cowan further testified that he was directly across the street (about 25-30 yards away) from the January 3 transaction. (DH Tr. 1, pg. 38). Cowan maintained that he saw these sales with his own eyes. *Id*., pg. 47.

Cowan explained that, during controlled purchases, they receive real-time audio, which is "pretty much clear," but that the video is "real choppy." (Tr. 23-24). Although sometimes the video stops, one still can hear the audio. *Id*. Cowan admitted that, at the time he submitted the warrant application, he knew that none of the videos depicted Manning's face. (Tr. 24-25).

Cowan further admitted that the CI used in this case no longer works for Metro Narcotics. (Tr. 27). He maintained, however, that, at the time of the warrant application, he believed that the CI was reliable. *Id*. Prior to learning that Manning was not present at the first two buys, Cowan had not experienced any issues with the CI. *See* Tr. 39. In fact, the CI had worked with the MPD on six independent narcotics investigations to conduct controlled purchases prior to the one with Manning. (Tr. 18-19). The information provided by the CI resulted in convictions in state and federal courts. *Id*.

Prior to submitting the warrant application in this case, the CI told Cowan that he was a relative of Manning's and that he was an associate of the DuceFive gang. (Tr. 7). Cowan also had obtained information from Manning's Facebook page prior to executing the search warrant. (Tr. 12). Cowan had not observed the CI with Manning, either in person or in photographs. (Tr. 13). However, the two are closely related. *Id*., pg. 14.

Cowan emphasized that Manning was contacted via his Facebook account and told the CI to come to his house where he resided. *Id*. pg. 28. Moreover, to Cowan's knowledge, no one else at that residence sold narcotics. *Id*.

Cowan had heard about Manning selling narcotics prior to his interactions with the CI. *Id*., pgs. 29-30. He further knew that Manning lived at "1300 [sic] Polk Street" with his Mom. *Id*. In other words, Cowan already had corroborated what the CI had reported to him. *Id*.

Cowan conceded that he did not ascertain Manning's phone number at the time of the first and second sales and, instead, relied on the CI's representation. (Tr. 32). However, Cowan looked at the CI's phone when the CI contacted Manning's Facebook page on January 2. (Tr. 35).

Before each of the four buys, the CI was searched and provided with money to purchase the drugs. (Tr. 38).

For the January 2 transaction at 3200 Polk Street, Cowan observed Manning in the carport of the residence with the CI. (Tr. 42-42). Prior to consummating the January 2 transaction, the CI had to leave the area to go make change, but he remained under constant surveillance the entire time. (Tr. 46). The MPD followed him "100 percent." *Id*. Cowan ended up giving the CI change, and then the CI "went right back." *Id*.

Cowan clarified that the warrant application contained a typographical error where it stated that for the January 3 transaction the CI completed a hand-to-hand transaction with "Stewart." (Tr. 6-7, 43-44). Instead, the application should have reflected that the transaction was with Manning. *Id*. Cowan did not discover the error until after the warrant had been

signed. *Id*. For the January 3 transaction, Cowan was able to observe the arm of the person that the CI identified as Manning. (Tr. 43).

## Law

"The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. AMEND. IV. The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207; 99 S.Ct. 2248, 2253 (1979) (citation omitted).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919

(1984)).  The exclusionary rule requires the suppression of evidence that is seized pursuant to a warrant unsupported by probable cause.  *Pope*, 467 F.3d at 916 (citation omitted). Nonetheless, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."  *Id.*

As recounted above, Manning contends that the search warrant obtained by Cowan was based on an affidavit that contained false statements, intentionally made or with reckless disregard for the truth.  Furthermore, once the false statements are excised, then the affidavit's remaining content does not suffice to establish probable cause.  *See, e.g.*, *United States v. Ortega*, 854 F.3d 818, 825 (5th Cir. 2017) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56; 98 S.Ct. 2674 (1978)).

In *Ortega*, the Fifth Circuit recognized that,

> [u]nder the Supreme Court's decision in *Franks*, a search warrant must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause.

*Ortega*, 854 F.3d at 826 (citing, *inter alia*, *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674).

Traditionally, a motion to suppress evidence discovered pursuant to a search warrant is analyzed under a two-step process.  *United States v. Sibley*, 448 F.3d 754, 757-758 (5th Cir. 2006) (citation omitted).  First, the court must decide whether the good-faith exception to the exclusionary rule applies.  *Id.*[3]  If this good faith exception applies, then the inquiry ends.

---

[3] "'The good-faith exception provides that where probable cause for a search warrant is founded

11

*Gibbs*, 421 F.3d at 357 (citation omitted). If the good-faith exception does *not* apply, then the court must proceed to the second step of the analysis to determine whether the warrant was supported by probable cause. *Gibbs*, 421 F.3d at 357.

In *Ortega*, however, the Fifth Circuit explained that the *Franks* inquiry effectively consists of three questions, all of which must be met: "First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?" *Ortega*, 854 F.3d at 826 (internal citations omitted).

Under a *Franks* analysis, "material omissions are treated essentially similar to claims of material misstatements." *United States v. Gonzalez*, Civ. Action No. 18-0482, 2018 WL 6174202, at *7 (S.D. Tex. Nov. 7, 2018), *R&R adopted,* 2018 WL 6173724 (S.D. Tex. Nov. 26, 2018) (citations omitted). Moreover, the defendant must show more than mere "negligence or innocent mistake" by the affiant. *United States v. Ortega*, 719 Fed. App'x. 319, 323–24 (5th Cir. 2018) ("*Ortega II*") (citations omitted). However, "recklessness may be shown circumstantially 'when reasons to doubt [the] information's veracity are obvious.'" *Id*., at 324-25 (citations omitted).

---

on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded.'" *Sibley, supra* (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002)). Because the exclusionary rule is designed to deter misconduct rather than to punish the errors of judges and magistrates, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted). The government bears the burden of demonstrating that the good faith exception applies. *United States v. Gant*, 759 F.2d 484, 487 (5th Cir. 1985).

Finally, probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317 (1983)). A magistrate requires only a substantial basis for concluding that a search will uncover evidence of wrongdoing. *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted). Relatedly, "[w]hen an affiant relies upon information obtained from an informant, the affiant must provide sufficient information to allow the magistrate to determine, by reviewing the totality of the circumstances, whether the informant's information is sufficient to create probable cause." *United States v. Brown*, 567 Fed. App'x. 272, 282 (5th Cir. 2014) (citation omitted).

## Discussion

By agreement of the parties, and upon review of the evidence, the court finds that the search warrant affidavit completed by Detective Cowan contained various misstatements, inaccuracies, and/or omissions. The affidavit incorrectly stated that Manning was involved in the December 28 and 30 controlled buys when, in fact, he was on a cruise. Moreover, while the affidavit stated that the RCI was provided with a recording device that transmitted audio, video, and GPS location information, it failed to mention that the video quality was of poor quality and that Manning's face could not be recognized. In addition, for the January 2 purchase, the affidavit did not explain that the CI had to go make change.

Nonetheless, the court is not persuaded that the false statements and omissions were made intentionally or with reckless disregard for the truth. Cowan testified that he had used this CI on at least six prior cases, without issue. Furthermore, Cowan appeared conscientious and

13

sincere about his desire not to wrongly charge someone. In fact, based on questions raised at the initial detention hearing, he took it upon himself to research whether Manning was on a cruise when some of the controlled buys occurred.

Manning contends that Cowan was reckless for failing to check and see whether the phone number used by the CI for the first two buys was Manning's number. However, at the time he executed the affidavit, Cowan had two other controlled purchases with Manning that he had observed personally, including one that occurred at Manning's residence. Moreover, Cowan reviewed the CI's phone for the January 2 sale and saw that it went to Manning's Facebook. In addition, on January 19, Cowan and other agents observed Manning standing in the driveway of the residence when someone drove up, who then briefly entered and exited the residence, which was consistent with narcotics activity. While, in hindsight, Cowan should have confirmed that the phone number that the CI used for the December controlled buys was Manning's number, the court cannot say that his failure to do so was an obvious or reckless omission, considering the other corroborating evidence that Cowan had at the time regarding Manning's participation in the January controlled purchases.

Citing inconsistencies in Cowan's testimony at the hearings held herein, Manning contends that Cowan's testimony is neither credible nor reliable. However, most of the inconsistencies identified by Manning pertain to the December controlled purchases, which Cowan later corrected once he discovered that Manning had been on a cruise. Nonetheless, Manning emphasizes that Cowan stated at the detention hearing that the January 2 sale took place in the afternoon and that he clearly could identify Manning, but then testified at the suppression hearing that the sale occurred at 10:00 p.m., and he was two blocks away. *See* Def.

Reply, pg. 3. At the suppression hearing, however, Cowan candidly conceded that he had been "100 percent wrong" when he had said that the sale had been in the afternoon. (Tr. 17). Moreover, at the detention hearing, Cowan, in fact, disclosed that they had been two blocks away from the January 2 transaction, but added that he and other officers passed by the location and "100 percent identified" Manning prior to the purchase. (DH Tr. 1, pgs. 37-38).

Manning further faults Cowan for not disclosing in the search warrant application that, for the January 2 controlled buy, the CI had to leave the area to go obtain change before consummating the deal. However, Cowan and the MPD maintained constant surveillance on the CI when he went to make change. (Tr. 46). Once he obtained the money, the CI "went right back." *Id*.

In sum, despite occasional error or misstatement, which he took pains to redress, Detective Cowan's testimony remains credible and sincere. Accordingly, the court finds that the errors in the search warrant affidavit were neither intentional nor reckless. Consequently, the agents were entitled to rely on the search warrant in good faith.

While the foregoing finding, alone, proves dispositive of the present motion, the court further finds that the warrant affidavit is supported by probable cause, even after the false and misleading statements are excised or reformed. For example, the January 2 controlled purchase that was consummated under the carport of Manning's residence at 3200 Polk Street suffices to provide probable cause for a search warrant for that residence, notwithstanding the lack of corroborating video or audio evidence. Prior to the purchase, agents ensured that the RCI had no narcotics. However, after the RCI's hand-to-hand transaction with Manning in the carport of the residence, the RCI returned and provided Cowan with the purchased marijuana.

Furthermore, the RCI's reliability, at least for the January 2 transaction, was confirmed by Cowan's own surveillance. *See United States v. Nguyen*, 172 Fed. App'x. 558, 561 (5th Cir. 2006) (officer's affidavit established a nexus between the residence and the illegal activity through normal inferences as to where the articles sought would be located); *Gibbs*, 421 F.3d at 359 ("an officer may rely in good faith on an issued-warrant based on an affidavit describing a single drug buy conducted by a confidential informant supervised by the affiant officer") (citations omitted); *United States v. Williams*, 603 F.2d 1168, 1171 (5th Cir. 1979) (informant's reliability was fully established by the explicit claim of past reliability made by the officer to the affiant).

Manning also contends that the information in the warrant application was stale. Staleness is determined on the facts of each case. *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir. 1984). The courts will not mechanically count the lapsed days or weeks between the facts set forth in the affidavit and the issuance of the warrant. *Id*. "[T]he amount of delay which will make information stale depends upon the particular facts of each case, including the nature of the criminal activity and the type of evidence sought." *United States v. Freeman*, 685 F.2d 942, 951 (5th Cir.1982) (citation omitted). Probable cause depends upon averred facts which are closely related in time to the issuance of the warrant. *United States v. McKeever*, 5 F.3d 863, 866 (5th Cir. 1993). Time becomes less significant, however, when the affidavit recites protracted or continuous activity. *Id*. In *United States v. Ruff*, the Fifth Circuit found that an almost two-month interval between the last observation of a drug laboratory by an informant and the ensuing search warrant did not render the warrant stale. *United States v. Ruff*, 984 F.2d 635 (5th Cir. 1993). Likewise, an ongoing drug trafficking scheme that lasted until two

weeks before the warrant was issued was held not to be stale. *Webster, supra*.

Here, the information in the warrant application was not stale because on the same date as the warrant application, Cowan and other agents observed what appeared to be another narcotics transaction at the subject residence. Moreover, there is no indication that the occupants of the residence were inclined to abandon their activities and dispose of their inventory in the intervening four-day period between issuance and execution of the search warrant.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 37] filed by Defendant Kylan Manning be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 13th day of May, 2024.

_____
KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE